**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAMIE MOORE, et al.,                  :
                                      :
        Plaintiffs,                   :    CIVIL ACTION No. 05-2971 (MLC)
                                      :
        v.                            :    **MEMORANDUM OPINION**
                                      :
ASBURY PARK BOARD OF                  :
EDUCATION, et al.,                    :
                                      :
        Defendants.                   :
_____:

**COOPER, District Judge**

        This matter comes before the Court on the motion by
plaintiffs, Mamie Moore ("Moore") and James Maynard ("Maynard")
(collectively, "plaintiffs"), for preliminary injunctive relief.
Plaintiffs filed the complaint on June 9, 2005 and filed the
motion on June 21, 2005.  The parties submitted briefs in support
of and in opposition to the motion, and the Court heard oral
argument on the motion on August 16, 2005.  The parties waived
the holding of an evidentiary hearing in favor of the Court
deciding the matter on the papers submitted by the parties.  The
Court will grant in part and deny in part plaintiffs' request for
a preliminary injunction for the reasons stated in this
memorandum opinion.

**BACKGROUND**

## I.    **The Parties**

Plaintiffs are residents of Asbury Park, New Jersey. (Compl. at ¶¶ 7-10.)  Moore is a member of both the Parent Teacher Student Organization and the Student Leadership Committee at Asbury Park High School, as well as the Government and Education Committee of the Asbury Park Concerned Christian Coalition, and is a grandmother of three children who attend Asbury Park schools.  (Id.)  Maynard is a public school teacher as well as the president and founder of the Asbury Park Improvement Association.  (Id.)  Maynard is the husband of Susan Maynard, a member of the Asbury Park Board of Education (the "Board").  (Id. at ¶ 11.)

The Board and individual Board members are the defendants. The Board is a governmental entity responsible for administering the elementary and secondary schools of Asbury Park, and it sets policy for the school district.  (Compl. at ¶ 12; Ans. at ¶ 12.) Defendant Antonio Lewis is the superintendent of the Asbury Park school system.  (Compl. at ¶ 13; Ans. at ¶ 13.)  Defendant Robert DiSanto ("DiSanto") is the president of the Board.  (Compl. at ¶ 14; Ans. at ¶ 14.)  DiSanto was elected by the citizens of Asbury Park to serve as a member of the Board in April 2003.  (DiSanto Cert., ¶ 8.)  DiSanto was appointed as president of the Board in May 2004 by the county superintendent.  (Id.)  The remaining

2

defendants, Amsden Bernier, Frank D'Allesandro, Garrett Giberson, Adrienne Sanders, and Eileen Sonnier, are members of the Board. (Compl. at ¶¶ 15-19; Ans. at ¶¶ 15-19.)

DiSanto was the general manager of Club Paradise (the "Club"), a night club in Asbury Park, from the time he was elected to the Board in April 2003 until September 2004. (Compl. at ¶ 28; Ans. at ¶ 28.) During that time, the Club promoted its activities in a monthly publication called "The Palm," recent and archived editions of which were available at the Club's web site, www.paradisenj.com. (Compl. at ¶¶ 31-32; Ans. at ¶¶ 31-32.) The web site is publicly accessible and imposes no age verification requirement. (Compl. at ¶ 32; Ans. at ¶ 32.) Editions of "The Palm" published during DiSanto's tenure on the Board contained an introductory statement by DiSanto along with his picture. (Compl. at ¶ 33; Ans. at ¶ 33.) These editions also contained, inter alia: a picture of an apparently naked pornography star, and a link to a pornographic web site, in connection with his appearance at the Club; promotion of a Club "sexware" party; promotion of "hot-hot go-go boys" at the Club; promotion of a "Battle of the Bulges" underwear contest at the Club ("Don't be shy kids, we're not looking for the biggest bulge, we're looking for who looks the best in their skivvies."); promotion of a movie playing at the Club called "Eating Out," which featured a photo of two shirtless, apparently teenage boys about to kiss and the

text: "be prepared . . . to drool over the gorgeous boys."
(Compl. at ¶ 34; Ans. at ¶ 34.)

## II.   **The Board Meetings**

The Board holds regular meetings at which it conducts its business.  (Compl. at ¶ 22; Ans. at ¶ 22.)  These meetings are open to the public, and a portion of each meeting is set aside as a public comment period.  (Compl. at ¶¶ 23, 25; Ans. at ¶¶ 23, 25.)

At the May 13, 2004 meeting, during the public comment period, Maynard said he was "upset with the County Superintendent's choice of Robert DiSanto as Board President" and asked "to know the specific criteria used in making the selection."  (Excerpts of Board Minutes from 5-13-04 Meeting at 21, App. of Exhibits Supp. of Mot. for Prelim. Inj., Ex. ("Pl's Ex.") Q.)

At the June 2, 2004 meeting, Susan Maynard spoke critically of DiSanto's appointment to the Board presidency and mentioned "receiving many phone calls from parents unhappy about the appointment and expressing concern about the [Club] website."  (Compl. at ¶ 36; Ans. at ¶ 36.)

At the June 14, 2004 meeting, Asbury Park resident Donna Harrison ("Harrison") and another speaker during the public comment period commented on the fact that the children of plaintiff Maynard and Board member Susan Maynard did not attend

4

Asbury Park public schools.  (Compl. at ¶ 37; Ans. at ¶ 37.)
Harrison referred to criticism of DiSanto by the Maynards as
"cowardly attacks."  (Compl. at ¶ 38; Ans. at ¶ 38.)

At the June 16, 2004 meeting, during the public comment
period, resident John Figuerido "spoke of despicable behavior
displayed by some Board Members" and "announced that he [would]
begin the process for a recall vote for Susan Maynard's seat on
the Board."  (Compl. at ¶ 40; Ans. at ¶ 40; Excerpts of 6-16-04
Board Mtg. at 25, Pl.'s Ex. R.)  Resident Tracy Stark said she
would "'second' [Figuerido's] vote to remove Susan Maynard."
(Compl. at ¶ 41; Ans. at ¶ 41; Excerpts of 6-16-04 Board Mtg. at
25, Pl.'s Ex. R.)

At the September 16, 2004 meeting, two policies relating to
sexual harassment (Policies 3362 and 4352) were on the Board's
agenda.  (Compl. at ¶ 45; Ans. at ¶ 45.)  Moore was recognized to
speak by DiSanto during the public comment period and she
attempted to read a statement.  (Compl. at ¶¶ 47-48; Ans. at ¶¶
47-48.)  She said:

> I'm a member of the Concerned Christian Coalition and the
> statement that I'm reading tonight was prepared by Overseer
> Porter Brown, the founding member of the Concerned Christian
> Coalition and a Pastor of the Faith Baptist Tabernacle
> Church of Asbury Park.
>
> These are challenging times filled with great opportunity
> for advancement and better relationships and understanding
> within the City of Asbury Park. However, if voices within
> the community are silenced by the loud cries of those who
> have different views, then we are teaching our citizens and

especially our children that democracy and freedom of speech
actually have no place in our culture.

The media . . . both print and broadcast have up to this
point not covered the thorny issues we face [with] objective
balance but have chosen to give more coverage to a certain
perspective without presenting alternative views. That, too,
sends a detrimental message to the citizens of our
community.

So here we are tonight with the same controversy. While we
do not advocate discrimination, we uphold [Biblical] demands
concerning right and wrong choices people make. With that
stated let's be perfectly clear. Our concern has all to do
with the kind of role model the present President of the
Board of Education sends to impressionable children, our
children.

(Transcr. of Portion of 9-16-04 Board Mtg. at 2-3, Pl.'s Ex. A.)[1]

DiSanto then spoke:

Ms. Moore, we – we had already cautioned you that this is
not a personal attack here tonight. That we're not going to
open up to the public for personal attacks.

So, at that point I'm going to ask you to put the microphone
down.

(Id. at 3.)

_____

[1]   The parties agreed at oral argument that the submitted
transcripts accurately reflect the events of the Board meetings at
issue. Portions of comments are marked as "indiscernible" in
the transcripts. (See, e.g., Tr. of Portion of 9-16-04 Board Mtg.
at 2-3, Pl.'s Ex. A.) The Court has not been provided with
recordings of the meetings. However, we have been provided with a
copy of the prepared statement that Moore read at the 9-16-04
meeting. (See Statement to Asbury Park Board of Educ., Pl.'s Ex.
O.) We include, in the quoted language above, two words in
brackets that appear in the copy of the statement but which are
indiscernible in the transcript. We make no factual finding that
Moore said these two words as written in the prepared statement;
we include these words only to clarify Moore's statement as it
appears in the transcript.

Moore responded:

Well, I – I disagree with you that it's a personal attack . . . but I did anticipate that.

I do have copies for any of the Board Members that would like a copy.

(Id. at 3-4.)

DiSanto then recognized Board member Sanders to speak. (Id. at 4; Compl. at ¶ 54.) Sanders spoke about, inter alia: "the fact that she is a sinner who sins every day;" her college friendship with a lesbian classmate who later married a man; DiSanto's resignation from the Club; overreaction to a photograph of DiSanto that she claimed was from a Halloween party; Coretta Scott King's views on gay marriage; and gay parents of students in the Board schools. (Compl. at ¶¶ 55-59; Ans. at ¶¶ 55-59.) No member of the Board interrupted Sanders nor attempted to terminate her speech. (Compl. at ¶ 60; Ans. at ¶ 60.) DiSanto then said, inter alia, that the photo being discussed was a misrepresentation of who he is and that he had resigned from the Club for reasons unrelated to the Board. (Compl. at ¶ 61; Ans. at ¶ 61.) Board member D'Allesandro and three Asbury Park residents, including Harrison, then spoke in support of DiSanto. (Compl. at ¶¶ 62-66; Ans. at ¶¶ 62-66.)

Minister John Muhammad then questioned DiSanto about why he had not allowed Moore to finish her statement. (Compl. at ¶ 68; Ans. at ¶ 68.) In response, DiSanto said,

> This issue has been beaten to death. It's done . . . I'm not stepping down. The way – the way that you would handle this if you don't like me or you don't like my lifestyle, then don't vote for me again. That's how it's done. But at this meeting, the subject is done, it's dead, it's not going to change things. The state has come back to support me . . . The way that they would talk about this issue is at the polls, not in this forum, not here. Not here."

(Compl. at ¶ 69; Ans. at ¶ 69.)

At the October 14, 2004 meeting, two policies relating to inappropriate staff conduct (Policies 4281 and 3281) were on the Board's agenda.  (Compl. at ¶ 70; Ans. at ¶ 70.)  Maynard was recognized to speak by DiSanto and attempted to read a statement during the public comment period.  (Compl. at ¶¶ 72-73; Ans. at ¶¶ 72-73.)  The following exchange took place:

> [Maynard]: My name is James Maynard, President of the Asbury Park Improvement Association.
>
> At the last meeting on the 16th it was abruptly – abruptly terminated; you all went into Closed Session; a number of parents wanted to speak to the public.
>
> As you know, this issue of Robert DiSanto and the fact that he is still the Board President is still under contention. In the papers he said it was a non-issue but what I want to do is bring some facts to go into the record about Mr. DiSanto.
>
> [DiSanto]: Mr. Johnson –
>
> [Maynard]: In April, 2004, Mr. DiSanto was appointed as President. After and before this date Mr. DiSanto placed significant objectionable material on the Club Paradise website.
>
> [Gregory Johnson, Board counsel ("Johnson")]: Excuse me, Mr. Maynard –

[Maynard]: Mr. DiSanto –

[Johnson]: Mr. Maynard –

[Maynard]: – was the general manager –

[Johnson]: – I just want to warn you that under the Board policy there's certain limits to what you could say. Those limits require that you be civil, that you be respectful, that you do not direct any comments personally to the Board Members.

[Maynard]: Have I done that?

[Johnson]: Well, we're warning – we're warning you at this point, –

[Maynard]: You warned me the times before –

[Johnson]: – please –

[Maynard]: – and I'm an intelligent person and I appreciate your warning. Now, just thank you very much.

In April, 2004, Mr. DiSanto, the Board President, –

[Johnson]: Well, I just want to let you know, before you get too far out there, that we do have the ability to ask the Police to stop you from making these comments.

(Applause.)

[Johnson]: I just want to let you know that to personally direct these comments at a particular Board Member is improper. We're not –

[Maynard]: Why – why is it improper for me to read information to educate the public about an individual?

[Johnson]: Well, as I said before –

[Maynard]: Really, why is that improper?

9

[Johnson]: As I said before, -

[Maynard]: No, - answer that question.

[Johnson]: We have a policy -

[Maynard]: What is the impropriety there?

[Johnson]: We have a policy -

[Maynard]: What is the impropriety in a nation of freedom where you have a democratic society -

[Unidentified voice]: Why don't you read the Ordinance -

[Unidentified voice]: Come on, get out of here. Please.

[Unidentified voice]: It's disruptive.

[DiSanto]: All right, well, just let's keep some order please.

Mrs. - (indiscernible) - would you like to comment?

[Maynard]: No, - (indiscernible) -

(Applause.)

[Maynard]: - why are you - (indiscernible) - addressing me? What have I done wrong?

[Johnson]: Mr. Maynard?

[Unidentified voice]: Just keep composed.

[Maynard]: Are you going to allow me to read my statement or not?

[Johnson]: Well, if you're going to attack any Board Members personally, -

[Maynard]: Have I attacked anybody?

[Johnson]: - we're not - we're not going to allow that.

10

[Maynard]: Have I attacked anybody?

[Johnson]: Well, we know -

[Maynard]: We know what?

[Johnson]: - that you - we know that you have certain objections to the Board President.

[Maynard]: You know what this is now? You are surmising -

[Unidentified voice]: Oh, come on. Enough's enough. Enough's enough.

[Two unidentified voices]: (Indiscernible.)

[Unidentified voice]: (Indiscernible) - public's comments should be related to agenda items.

[Unidentified voice]: Well, the other people want to talk –

[Unidentified voice]: Come on.

[Maynard]: Are you going to let me talk about -

[Johnson]: Well, if you're - if you're not going to discuss the agenda -

[Maynard]: No, no, I can discuss governmental issues -

[Johnson]: That's not - that's not an issue.

[Unidentified voice]: (Indiscernible.)

[Unidentified voice]: Mr. Johnson, we have a Board policy that says that the public comments are to be made concerning agenda items.

[Maynard]: This is an agenda item.

[Unidentified voice]: That's a personal item of yours.

[Maynard]: So, you're telling me that the public who has concerns about the educational system here cannot address

anything in the educational system?

[Unidentified voice]: (Indiscernible.)

[Johnson]: I'm asking you that if you have anything to say -

[Maynard]: Let me read by [sic] statement and if you find it wrong, you can - you can - (indiscernible). Let me read my statement.

In April, 2004, Mr. DiSanto -

[Unidentified voice]: Why must we endure this?

[Unidentified voice]: (Indiscernible.)

[Unidentified voice]: We don't want to hear this.

[Johnson]: Mr. Maynard? Mr. Maynard? Mr. Maynard, we're not going to listen to that. If you -

[Maynard]: Why?

[Johnson]: - want to discuss that, then we're going to ask the Police Officer to remove you.

[Maynard]: Go ahead and have me removed. I have - have him remove me then.

[Unidentified voice]: Enough's enough.

[Maynard]: You go ahead then. (Indiscernible) - that statement.

In April of 2004, -

[Unidentified voice]: All right, I don't want to hear it -

[Unidentified voice]: Adhere to the policy.

[Maynard]: After and before this date, Mr. DiSanto has placed significant objectionable material -

[Unidentified voice]: (Indiscernible) -

12

[Maynard]: Are you going to tell this gentleman here -

(Indiscernible portion, several people speak at the same time.)

[DiSanto]: Let's - let's get some order in here.

[Maynard]: Thank you very much.

[DiSanto]: Mr. Maynard, please. We are trying to conduct a positive meeting here.

[Maynard]: I agree.

[DiSanto]: We have heard your concerns.

[Maynard]: You haven't heard my concerns. I'm going to read them tonight.

[DiSanto]: I believe we've heard it before.

[Maynard]: How can you surmise what someone's about to read?

[DiSanto]: Could we make it brief, please?

[Maynard]: You're going to give me my two minutes? And after those two minutes I can come back and get another two minutes. Thank you very much.

In April of 2004, Mr. DiSanto -

[Johnson]: Mr. President, wait, I would recommend that we have a Resolution going into Executive Session because we do have another legal matter and we can return after members of the Board have heard - have met with the attorney who's a special counsel.

[D'Allesandro]: I make a motion we go into Closed Executive Session.

[DiSanto]: Motion to go into Closed Executive Session made by Mr. D'Allesandro. Seconded by Mrs. Sonnier. To discuss personnel, litigation and matters of attorney/client

privilege. [Roll call was taken and the Board went into closed session.]

(Tr. of Portion of 10-14-04 Board Mtg. at 2-10, Pl.'s Ex. B.)

The Board reopened the public comment period following a closed session. (Id. at 10-12.) The first speaker during this second public session was Dennis Caufield ("Caufield"), plaintiffs' counsel in this action. (Id. at 12.) Caufield introduced himself as an attorney in consultation with Maynard and said, "What I'd like to do is address a topic that Mr. Maynard had wanted to put on record. They're simply facts that exist on a website located at Club Paradise." (Id.) Caufield and Johnson, following a few remarks by each, then had the following exchange:

[Johnson]: Mr. Caufield, I believe that your client did get an opportunity to speak earlier and he was interrupted because his speech or his statement was a personal attack upon one of the Board Members. And we really don't want to get into that. We believe we have the authority to limit areas that the public can talk about, so, you know, we would like to open the public participation up to other members of the public to talk.

There are concerns that people of the public may have. We've listened to what your client had to say tonight, so I'd ask you - we're asking you -

We don't want to hear that. Okay? We - we heard your client make a statement not only tonight but at previous Board meetings.

[Caufield]: Sir, you're assuming what he's going to put on the record. He's not going to put on the record tonight what he put on at other business meetings - rather other Board meetings.

14

[Johnson]: Well, we know what he said before and he's already spoken about that issue. So, -

[Caufield]: (Indiscernible) – he was not given an opportunity. I'm going to speak about something different than what you anticipate . . .

. . .

[Johnson]: Does that concern a member of the Board of Education? That's what I'm - all I'm asking you?

Your speech, will that concern a member of the Board of Education?

[Caufield]: Yes, it will, sir.

[Johnson]: Okay, sir, we don't have to go into that.

. . .

[Caufield]: You haven't heard what I have to say.

[Johnson]: You just said that you're going to comment about an individual Board Member. We - you know that is a personal attack.

[Caufield]: It's - no, what I'm going to represent are only materials that he placed on the website.

[Johnson]: No, no, no, no, no.

(Id. at 12-15.)

Johnson then recognized a Mr. Crudup, who spoke about agenda items.  (Id. at 16.)  Maynard then spoke again, and had the following exchange with an unidentified Board member or members:

[Maynard]: My name is James Maynard . . . and I have a question about the minutes.

If you look at item 10(a), which was referred to Mr. Crudup,

15

they talk about the - this - inappropriate staff conduct, policy 4281.

[Board member]: May I have a point of order?

[Johnson]: Yes.

[Board member]: Is this staff conduct or Board of Education conduct?

[Johnson]: Staff members.

[Board member]: Staff conduct. We are not members of the staff.

[Johnson]: That's right.

[Board member]: This particular policy does not apply to the Board of Education. It applies to the staff of the Board of Education. Therefore, the policy that they're talking about has nothing to do with the Board of Education and we will not accept personal attacks upon the Board of Education. That is outside of our policy. Our policy does not permit it.

[Maynard]: Has there been a personal attack? I'm asking about the minutes here.

(Id. at 16-17.)

At the November 18, 2004 Board meeting, Maynard attempted to read a statement during the public comment period. (Compl. at ¶¶ 88-89; Ans. at ¶¶ 88-89.) The minutes reflect that, in response to Maynard, Board counsel "clarified that Policy # 4281 applies to staff only, not Board Members. He further explained that this Board has no jurisdiction over misconduct of a Board Member." (Excerpts of Board Minutes from 11-18-04 Meeting at 27, Pl.'s Ex. V.)

16

### III. **The Challenged Policy**

Plaintiffs challenge the constitutionality of certain provisions of Board Bylaw 0167 (the "Bylaw") and seek a preliminary injunction to prevent the Board from enforcing those provisions.  The Bylaw, entitled "Public Participation in Board Meetings," states:

> The Board of Education recognizes the value of public comment on educational issues and the importance of allowing members of the public to express themselves on school matters of community interest.
>
> In order to permit the fair and orderly expression of such comment, the Board shall provide a period for public comment at every public meeting.
>
> Public participation shall be permitted at the discretion of the presiding officer.
>
> Public participation shall be extended to residents of this district, persons having a legitimate interest in the actions of this Board, persons representing groups in the community or school district . . . except when the issue addressed by the participant is subject to remediation by an alternate method provided for in policies or contracts of the Board.
>
> Public participation shall be governed by the following rules:
>
> > 1.   A participant must be recognized by the presiding officer . . .
> >
> > 2.   Each statement made by a participant shall be limited to three minutes' duration, or at the discretion of the presiding officer;
> >
> > 3.   No participant may speak more than once on the same topic until all others who wish to speak on that topic have been heard;

17

4.   All statements shall be directed to the presiding officer; no participant may address or question Board members individually;

5.   The presiding officer may:

   a.   Interrupt, warn, or terminate a participant's statement when the statement is too lengthy, personally directed, abusive, obscene, or irrelevant;

   b.   Request any individual to leave the meeting when that person does not observe reasonable decorum;

   c.   Request the assistance of law enforcement officers in the removal of a disorderly person when that person's conduct interferes with the orderly progress of the meeting;

   d.   Call for a recess or an adjournment to another time when the lack of public decorum so interferes with the orderly conduct of the meeting as to warrant such action; and

   e.   Waive these rules when necessary for the protection of privacy or the efficient administration of the Board's business.

(Asbury Park Board of Educ. Bylaw 0167, Pl.'s Ex. E.)

Plaintiffs specifically challenge the following phrases:

• The phrase "at the discretion of the presiding officer" in the third full unnumbered paragraph ("paragraph three");

• The phrase "personally directed" in numbered paragraph 5(a) ("paragraph 5(a)"); and

• The phrase "Waive the rules when necessary for the protection of privacy or the efficient administration

of the Board's business," in numbered paragraph 5(e)
("paragraph 5(e)"), <u>i.e.</u>, all of paragraph 5(e).[2]

Plaintiffs challenge the Board's policies and practices both
facially and as applied on the grounds that the policies (1)
constitute impermissible viewpoint-based restrictions in
violation of the First Amendment to the United States
Constitution, (2) in the alternative, are viewpoint neutral but
are unreasonable restrictions on speech, (3) are overbroad, and
(4) are void for vagueness.  (<u>See</u> Pl.'s Br. at 5-6.)

<u>DISCUSSION</u>

**I.   Preliminary Injunction Standard**

Injunctive relief is an "extraordinary remedy, which should
be granted only in limited circumstances."  <u>Frank's GMC Truck
Ctr., Inc. v. Gen. Motors Corp.</u>, 847 F.2d 100, 102 (3d Cir. 1988)
(citation omitted).  When determining whether to grant
preliminary injunctive relief, the Court must consider whether:
(1) the party seeking such relief has shown a reasonable
probability of success on the merits; (2) the moving party will
be irreparably injured by denial of the relief; (3) granting such
relief will result in even greater harm to the nonmoving party;
and (4) granting such relief will be in the public interest.

---

[2]   Plaintiffs withdrew a challenge, after oral argument, to
the phrase "or at the discretion of the presiding officer" in
numbered paragraph 2.  <u>See</u> Notice of Amendment to Requested
Relief (docket entry no. 15).

See, e.g., Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999); ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996).  When relevant, the Court also considers possible harm to interested third parties. See, e.g., Oburn v. Shapp, 521 F.2d 142, 152 (3d Cir. 1975). "The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief."  Amer. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994) (citations omitted).

## II.  Reasonable Probability of Success on the Merits

The party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation." Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir. 1982).  In evaluating whether a moving party has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits."  Oburn, 521 F.2d at 148 (citations omitted).

Plaintiffs must demonstrate a reasonable probability of success on the merits of their claim that the Board's policy is an impermissible restraint on speech.  The standard we use in

20

reviewing restrictions on speech, such as the Bylaw, depends on
the type of forum where the speech is restricted.  <u>Bach v. Sch.
Bd. of the City of Virginia Beach</u>, 139 F.Supp.2d 738, 741 (E.D.
Va. 2001).  The parties agree that the forum here, the Board
meeting, is a limited public forum.  (<u>See</u> Pl.'s Br. at 7-8;
Def.'s Br. at 11-13.)  <u>See</u> <u>Leventhal v. Vista Unified Sch. Dist.</u>,
973 F.Supp. 951, 957 (S.D. Ca. 1997) (finding open school board
meetings to be limited public fora, <u>i.e.</u>, "fora open to the
public in general, but limited to comments related to the school
board's subject matter") (quotations and citations omitted); <u>see
also</u> <u>Bach</u>, 139 F.Supp.2d at 741 (same).

       In limited public fora like the Board meetings,

       content-neutral regulations may be drawn to restrict the
       time, place, and manner of protected speech, as long as the
       regulation is narrowly tailored to serve a significant
       governmental interest and leaves open ample alternative
       channels for communication. Content-based regulations,
       however, are subject to a more exacting standard of scrutiny
       and must be narrowly drawn to achieve a compelling state
       interest.

<u>Bach</u>, 139 F.Supp.2d at 741 (citations omitted).  <u>See</u> <u>also</u>
<u>Eichenlaub v. Twp. of Indiana</u>, 385 F.3d 274, 280-81 (3d Cir.
2004) ("[A limited public forum] is reviewed under a sliding
standard that allows for content-related regulation so long as
the content is tied to the limitations that frame the scope of
the designation, and so long as the regulation is neutral as to
viewpoint within the subject matter of that content.").  We will

consider the challenged provisions of the Bylaw in two groups for
the purposes of this analysis: (1) the provisions that grant
discretion to the presiding officer to restrain speech
("discretionary provisions") and (2) the provision that limits
speech that is personally directed ("personally directed
provision").

> A.   <u>Discretionary Provisions</u>

Plaintiffs challenge the following provisions of the Bylaw
that grant discretion to restrain speech to a Board meeting's
presiding officer:

- The phrase "at the discretion of the presiding officer"
  in paragraph three; and

- The phrase "Waive the rules when necessary for the
  protection of privacy or the efficient administration
  of the Board's business," in paragraph 5(e).

Plaintiffs characterize the discretion afforded the presiding
officer by paragraph three and paragraph 5(e) (collectively the
"discretionary provisions") as "unbridled" and argue that
granting such discretion to one person "allows a single public
official to determine which members of the community get to
address the forum and even gives the latitude to waive the rules
when that one person deems it necessary."  (Pl.'s Reply Br. at 8-
9.)

Plaintiffs challenge the discretionary provisions both
facially and as applied.  Plaintiffs argue generally that DiSanto

has used the discretion granted by the discretionary provisions
to prohibit viewpoints critical of his own fitness for office.
(Pl.'s Reply Br. at 8-9.)  Plaintiffs, however, do not point to
instances when DiSanto allegedly used his discretion to waive any
rules pursuant to paragraph 5(e).  Neither do plaintiffs argue
that DiSanto used his discretion pursuant to paragraph three in a
manner other than to prevent negative statements about him.
Plaintiffs' as-applied challenge, then, is based solely on the
Board's use of discretion in applying the "personally directed"
provision.  The Court, as discussed _infra_, will order the
"personally directed" provision to be stricken from the Bylaw.
The plaintiffs' motion requests only prospective injunctive
relief.  (_See_ Pl.'s Rev. Prop. Ord. Granting Prelim. Inj. (dkt.
entry no. 5).)  The Court, therefore, will not consider
plaintiffs' as-applied challenge to the discretionary provisions
because defendants will not be able to apply those provisions in
the future in the manner complained of, _i.e._, to enforce the
"personally directed" provision.  We will consider only
plaintiffs' facial challenge to the discretionary provisions.

The standard of review for plaintiffs' challenge to the
discretionary provisions depends on whether the regulation is
content neutral or content based.  A restriction on speech is
content neutral if it is "justified without reference to the
content of the regulated speech."  <u>Scroggins v. City of Topeka</u>, 2

23

F.Supp.2d 1362, 1371 (D. Kan. 1998) (quotations and citation
omitted).  "A regulation that serves purposes unrelated to the
content of the expression is deemed neutral, even if it has an
incidental effect on some speakers or messages but not others."
Scroggins, 2 F.Supp.2d at 1371 (quotations and citation omitted).
The language of these discretionary provisions makes no reference
to any particular content or viewpoint that may be expressed at a
Board meeting.  These provisions serve a purpose unrelated to the
content of any speech that may be limited pursuant to their grant
of discretion, specifically, the fair and orderly expression of
public comment.  (See Bylaw 0167 at second full unnumbered
paragraph, Pl.'s Ex. E.)  The presiding officer may waive a rule
for the protection of privacy or the efficiency of the Board's
meeting without reference to a given statement's content.  (Id.
at ¶ 5(e).)  And, although the presiding officer is given
discretion to permit public participation, the Bylaw emphatically
recognizes the value of public comment and states that public
participation "shall be extended" to residents of the district
and other interested parties.  (Id. at first and fourth
unnumbered paragraphs.)  We therefore find that the discretionary
provisions are content neutral.

     The validity of these provisions, then, depends on their
being narrowly tailored to serve a significant governmental
interest and on their leaving open ample alternative channels for

communication.  Bach, 139 F.Supp.2d at 741.  The government has a recognized significant interest in conducting orderly, efficient, effective, and dignified meetings of its public bodies.  See Scroggins, 2 F.Supp.2d at 1372 (citing cases).  For the presiding officer of a Board meeting to "allow a speaker to try to hijack the proceedings, or to filibuster them, would impinge on the First Amendment rights of other would-be participants." Eichenlaub, 385 F.3d at 281.  The discretionary provisions are aimed squarely at serving the Board's significant interest in orderly, efficient meetings.  Far from regulating content in advance, these provisions simply give the presiding officer the requisite discretion to supervise public meetings.

     The challenged provisions also leave open ample alternative channels for communication.  See Bach, 139 F.Supp.2d at 741. These provisions do not close off channels for communication but rather serve as guidelines for the form of such communication. The Bylaw, for example, limits each statement to three minutes' duration but does not limit the number of statements a speaker may make.  The Bylaw emphasizes the importance of public comment and dictates that public participation "shall" be permitted unless an alternate method of remediation is provided by the policies of the Board.

     We find that the discretionary provisions are content neutral.  We find further that these provisions are narrowly

25

tailored to serve a significant governmental interest and leave open ample alternative channels of communication.  We hold, therefore, that plaintiffs have failed to demonstrate a reasonable probability of success on the merits of their claim that these provisions of the Board's policy are an impermissible restraint on speech.

    B.    "Personally Directed" Provision

    We must determine the appropriate standard of review for plaintiffs' challenge to the "personally directed" provision, again based on a determination of whether the challenged provision is content based or content neutral.  Courts have found similar school board policies to be content-based restrictions.  In Leventhal v. Vista Unified Sch. Dist., 973 F.Supp. 951 (S.D. Ca. 1997), plaintiffs challenged a school board bylaw that permitted the board president to terminate a presenter's comments if the presenter, after a warning, persisted in making improper remarks, which included complaints against individual employees of the school district unless such employees consented to the remarks.  Leventhal, 973 F.Supp. at 953-54.  The Leventhal court found such a prohibition on criticism to be a content-based regulation.  Leventhal, 973 F.Supp. at 957.  Similarly, in Bach v. Sch. Bd. of the City of Virginia Beach, 139 F.Supp.2d 738 (E.D. Va. 2001), plaintiffs challenged the constitutionality of a school board bylaw that, inter alia, prevented persons addressing

26

the board at meetings from making "attacks or accusations regarding the honesty, character, integrity or other like personal attributes of any identified individual or group." Bach, 139 F.Supp.2d at 741 n.1. The Bach court, in finding the bylaw to be an unconstitutional restraint on speech, found the bylaw to be content based. Bach, 139 F.Supp.2d at 742-44. See also Baca v. Moreno Valley Unified Sch. Dist., 936 F.Supp. 719, 725 (C.D. Cal. 1996) (finding similar bylaw to be content based).

We find that the "personally directed" provision of the Bylaw, on its face and as applied by the Board, contains content-based restrictions on speech. The effect of this provision is similar to the effects of content-based restrictions in the case law: "Participants in an open session of a public meeting were permitted to praise the actions of [individuals] but were prohibited from making any critical or accusatory comments." Bach, 139 F.Supp.2d at 742. The record shows that the Board consistently relied on this provision to prevent plaintiffs from criticizing DiSanto but conversely did not prevent other speakers from supporting him. In so doing, the Board in effect implemented a policy of preventing personal attacks rather than preventing all personally directed comments. Indeed, Board members often used the phrase "personal attack" instead of "personally directed" – a phrase that rarely appears in the transcripts. At the September 16, 2004 meeting, for example,

27

DiSanto interrupted Moore, warned her against making personal attacks, and asked her to put down the microphone.  Three Board members, including DiSanto, and three members of the public then spoke in support of DiSanto without interruption.  At the October 14, 2004 meeting, Maynard was prevented from speaking on the grounds that his speech would involve personal attacks.  When Maynard attempted to ask about Board Policy 4281, an item on the agenda, the Board cut him off on the basis of preventing personal attacks before he articulated his question.[3]  "It is difficult to imagine a more content-based prohibition on speech than this policy, which allows expression of two points of view (laudatory and neutral) while prohibiting a different point of view (negatively critical) on a particular subject matter (District employees' conduct or performance)."  Baca, 936 F.Supp. at 730.

The "personally directed" provision, as a content-based restriction on speech in a limited public forum, is subject to review under the modified strict-scrutiny inquiry set out in Eichenlaub v. Twp. of Indiana, 385 F.3d 274 (3d Cir. 2004).[4]  A limited public forum is "reviewed under a sliding standard that

---

[3]  Another member of the public, Mr. Crudup, seems to have been allowed to speak about the same Policy without incident.

[4]  Earlier cases applied a strict scrutiny test, under which a content-based restriction was permissible only if narrowly drawn to advance a compelling state interest.  See Bach, 139 F.Supp.2d at 741; Leventhal, 973 F.Supp. at 957.  We apply the modified test described by the Third Circuit in Eichenlaub.

allows for content-related regulation so long as the content is
tied to the limitations that frame the scope of the designation,
and so long as the regulation is neutral as to viewpoint within
the subject matter of that content." Eichenlaub, 385 F.3d at
280-81.  This provision of the Bylaw cannot withstand such
scrutiny.  Assuming arguendo that the limitation on personally
directed comments is tied to the limited subject matter of the
Board meetings, we find that the provision is not neutral as to
viewpoint within that limited subject matter.  The Bylaw, as
applied by the Board, limits the expression of one viewpoint,
i.e., negative criticism of the Board president, but does not
limit the opposing viewpoint.  Viewpoint-based regulations are
improper.  Eichenlaub, 385 F.3d at 281 n.3.

     "[T]he ability to question the fitness of the community
leaders, including the administrative leaders in a school system,
especially in a forum created specifically to foster discussion
about a community's school system," is an important public
interest.  Bach, 139 F.Supp.2d at 743.  A policy that "deters
individuals from speaking out on an issue of public importance
violates the First Amendment." Bach, 139 F.Supp.2d at 743.  We
find that the words "personally directed" as they appear in
paragraph 5(a) of the Bylaw and as applied by the Board are a
content-based restriction on speech.  We find that these words
have the effect of an impermissible viewpoint-based restraint and

are unconstitutional.  Because we find the challenged provision
to be an unconstitutional restraint on speech in a limited public
forum, we find that plaintiffs have demonstrated a substantial
likelihood of success on the merits of their challenge to this
provision of the Bylaw.

We find also, however, that the "personally directed"
provision is not an essential part of the Bylaw and that the
Bylaw as a whole does not depend on the validity of that
provision.  The "personally directed" provision is not essential
to the Bylaw's goal of permitting the fair and orderly expression
of public comments, and numerous other provisions in the Bylaw
contribute toward that end.  See Bach, 139 F.Supp.2d at 744
(finding the contested provision not to be essential to the
bylaw, ordering the contested provision stricken, and noting that
the remaining provisions of the bylaw remain unaffected by the
court's order).  Our striking the phrase "personally directed"
from the Bylaw will not affect the remaining provisions.

**III.  <u>Irreparable Injury to Moving Party</u>**

A.   <u>Discretionary Provisions</u>

"[A] failure to show a likelihood of success . . . must
necessarily result in the denial of a preliminary injunction."
<u>Morton v. Beyer</u>, 822 F.2d 364, 371 (3d Cir. 1987).  The Court,
having concluded that plaintiffs have not demonstrated a
reasonable likelihood of success on the merits of their claims as

to the discretionary provisions of the Bylaw, need not determine whether plaintiffs have satisfied the remaining requirements for preliminary injunctive relief as to these claims.  <u>Forum for Academic & Inst'l Rights, Inc. v. Rumsfeld</u>, 291 F.Supp.2d 269, 322 (D.N.J. 2003).  We will address briefly the remaining factors, though, for the sake of completeness.

We find no irreparable harm suffered by plaintiffs as a result of the discretionary provisions of the Bylaw.  Plaintiffs have not shown that any rules were waived to plaintiffs' detriment.  To the extent that plaintiffs suffered injury by the restraint on their speech, we find that such injury was caused not by the discretionary provisions of the Bylaw but rather by the "personally directed" provision.

B.   <u>"Personally Directed" Provision</u>

A party seeking a preliminary injunction must make a "clear showing of immediate irreparable injury."  <u>Hohe v. Casey</u>, 868 F.2d 69, 72 (3d Cir. 1989).  The deprivation of liberties protected by the First Amendment typically constitutes irreparable injury.  <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976).  "A plaintiff who meets the first prong of the test for a preliminary injunction will almost certainly meet the second, since irreparable injury normally arises out of the deprivation of speech rights."  <u>ACLU v. Reno</u>, 217 F.3d at 172 (citation omitted).  <u>See also</u> <u>Child Evangelism Fellowship of New Jersey,</u>

31

<u>Inc. v. Stafford Twp. Sch. Dist.</u>, 233 F.Supp.2d 647, 666-67 (D.N.J. 2002) (same).

The Board argues that plaintiffs have not suffered irreparable harm because their constitutional rights have not been violated.  (Def.'s Br. at 30.)  This argument fails, as we have found already that defendants are likely to succeed on the merits of their constitutional claim with regard to the "personally directed" provision.  We find that, because plaintiffs suffered a deprivation of their speech rights as described <u>supra</u>, plaintiffs have made a clear showing of irreparable injury.

**IV.  <u>Greater Harm to Nonmoving Party</u>**

The Court also must consider the harm to the nonmoving party if the requested injunction is granted.  Defendants argue that if plaintiffs' request for injunctive relief is granted the Board will lose its ability to conduct efficient and effective public meetings because it will have no way to control chaos stemming from public speakers' conduct.  (Def.'s Br. at 30.)  We disagree.  Although the Court will grant plaintiffs' request for injunctive relief as to the "personally directed" provision of the Bylaw, the Board will retain the robust set of rules currently set out by the Bylaw.  The discretion of the presiding officer will remain intact, as will the remaining provisions of paragraph 5(a).  The presiding officer retains the ability, for example, to

32

interrupt or terminate speech that is too lengthy, abusive, obscene, or irrelevant.  The Court recognizes the significant interest the Board has in the orderly and efficient administration of its business, and we expect the Board's ability to conduct its business in such a manner will not be diminished by our ruling.

**V.    The Public Interest**

Neither the government nor the public itself can claim an interest in enforcing an unconstitutional law.  Child Evangelism, 233 F.Supp.2d at 667.  The public interest, therefore, favors the granting of injunctive relief as to the "personally directed" provision of the Bylaw.  However, the public interest favors the denial of injunctive relief as to the discretionary provisions because those provisions serve the important public interest in the fair and orderly administration of Board of Education business without improperly restricting public comment on the Board's business.

**VI.   No Bond Required**

No bond requirement will be imposed pursuant to Federal Rule of Civil Procedure 65(c), because we find that this case falls within that exceptional class of cases warranting relief from the bond requirement.  See, e.g., First Puerto Rican Festival v. Vineland, 108 F.Supp.2d 392, 396 (D.N.J. 1998).

## **CONCLUSION**

We will grant plaintiffs' request for a preliminary injunction as to the phrase "personally directed" in paragraph 5(a) of the Bylaw and deny plaintiffs' request as to the remaining provisions.  The Court directs the parties to submit a proposed order consistent with this memorandum opinion.[5]

   s/ Mary L. Cooper

**MARY L. COOPER**
United States District Judge

---

[5]  Because we find the resolution of plaintiffs' constitutional claims fully dispositive of plaintiffs' request for a preliminary injunction, we do not reach plaintiffs' claims pursuant to the New Jersey state constitution or the New Jersey Open Public Meetings Act, N.J.S.A. § 10:4-12, at this time.